EDWARD F. CULLEN, # 133155
WILLIAMS, PINELLI & CULLEN, LLP
110 North Third Street
San Jose, California 95112
Telephone:   (408) 288-3868
Facsimile:   (408) 288-3860

MARC L. PINCKNEY, #127004
4660 La Jolla Village Drive
Fifth Floor - PMB 50077
San Diego, California   92122
Telephone:  (408) 857-0880


Attorneys for Plaintiff
Silicon Valley Telecom Exchange, LLC

UNITED STATES DISTRICT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Silicon Valley Telecom Exchange, LLC, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>VERIO, INC., a Delaware corporation; NTT AMERICA, INC., a Delaware corporation; and DOES 1 through 25, inclusive,<br><br>Defendants. | CASE NO.  12-CV-00899-HRL<br><br><br>**PLAINTIFF SVTX'S TRIAL BRIEF**<br><br><br>Judge: Hon. Howard R. Lloyd<br>Dept: Courtroom 2, 5th Floor<br>Trial Date: September 16, 2013 |

**INTRODUCTION**

In 1999 the Internet was an emerging force in the explosion of advanced communications and shared information. Much like today's concept of cloud computing, the potential impact of the Internet was an amalgam of limited achievements in an environment of unlimited possibility. The enthusiasm for what the future could bring drove individuals and businesses in a frantic effort to  be identified as leaders in their field. Often times, decisions were made and binding legal commitments embraced that might not have survived scrutiny in a more measured and

tempered business environment.

The San Jose Unified School District owned a large piece of property located at 250 Stockton Ave. in San Jose California. The property consisted of a two-story building constructed almost a half-century earlier to specifications that allowed each of the floors to support an incredible amount of weight. Faced with the reality that the space was no longer required to support school district operations, the San Jose Unified School District made the decision to offer the building for lease.

Mr. Fred Rubio, a commercial real estate agent in San Jose became aware of the building's availability via public notices published in the San Jose Mercury news. Although only one of many interested parties, Mr. Rubio's proposed terms and conditions for the lease, submitted to the San Jose Unified School District, were accepted, permitting the execution of a contract by Rubio and Associates, Inc., an entity owned by Mr. Rubio, with the school board. Mr. Rubio then assigned Rubio & Associates, Inc.'s rights and interest to Silicon Valley Telecom Exchange(SVTX), a small closely held corporation also owned by Mr. Rubio.

Following SVTX obtaining control of 250 Stockton Ave., SVTX developed a plan to convert the lease site from a school district warehouse into a telecommunications facility to service the burgeoning high-tech industry and leading companies such as Enron, NTTA and Verio. Millions of dollars were spent converting the 94,000 foot building and the adjacent land into a state-of-the-art facility by increasing the available power flow from the public utility, developing temperature control systems, installing satellite communications and incorporating advanced security systems into the site to identify just a few areas of improvement from the conditions that existed when the lease was first entered into with the school district.

It is important to recognize the state of the Internet in 1999, as the conditions in the industry today are more measured based on the experiences of the last 15 years. This case presents questions about the commitments that a lessor and a lessee made to each other in the rarefied air of 1999. The transactions in this case blend together not just with the terms of one

lease negotiated for 25 years by a commercial real estate agent with the school district, but the subsequent leases entered into by aggressive Internet participants, the defendants.

As one key employee of a party defendant to this case noted, the business model was fluid, often changing in a matter of months, not years. In this case, defendant Verio elected to vacate its relatively modest size operation at 250 Stockton Ave. approximately 2 years after executing a 20-year-old lease and spending millions of dollars to customize its leased space to meet its perceived corporate needs that extended beyond the money and renovations invested in the building by SVTX.

It cannot be overemphasized that a very important fact impacting of this case is that the property at 250 Stockton Ave. was subleased to the defendants, not by the owner of the property, the San Jose Unified School District, but by Mr. Rubio, on behalf his closely held company SVTX . In negotiating the master lease with the school district, Mr. Rubio agreed to multiple terms and conditions concerning the condition of the site at the time it would be delivered to him, and the conditions the project site was to be in when it was returned to the school district at the end of the lease. A copy of the lease with the school district was incorporate into the sublease agreements between Mr. Rubio and the defendants with a specific contractual clause in the written contract with the defendants acknowledging receipt of the master lease.

As Mr. Rubio was obligated to meet specific conditions for the state of the property at the end of the lease, those same conditions were incorporated into the subleases Mr. Rubio negotiated with all his tenants. As he was transferring possession and control of multiple spaces within the project at 250 Stockton Ave., Mr. Rubio needed to insure that his tenants conducted themselves in accordance with the same standards he and his company had promised to respect in the master least with the San Jose Unified School Board.

## **DISPUTE**

When the defendants entered into their separated subleases with SVTX to locate branch facilities of their telecommunications business at 250 Stockton Ave., the defendants insisted upon certain terms and conditions, they felt were essential to their business operations, in much the same way that Mr. Rubio insisted upon certain terms and conditions as to how the property was to be maintained by the

 tenants. The result were subleases in excess of 30 pages each, signed and executed by the parties.

The documents, specifically paragraph 34, contains a integration clause stating that the lease, together with its exhibits, contains all the agreements of the parties to the lease and supersedes any previous negotiations. The document further states that there have been no representations made by the landlord or understandings between the parties other than those that were set forth in the lease and it's exhibits. Significantly, the lease states, "this lease may not be modified except by the written instrument duly executed by the parties to this lease."

The businesses of the each of the defendants required of them to have backup electrical power available to immediately support the servers and related equipment that supported the subtenants business endeavors. Under the terms of the subleases, the defendants were granted the right to install up to three diesel fuel generators with sufficient capacity to meet the tenants projected use of the leased property. The tenant was also granted the right to install up to two diesel fuel tanks with a capacity of up to 4000 gallons.

Concurrent with the granting of the rights to construct a diesel powered backup electrical system were extensive obligations dealing with potential environmental contamination and the duty to return the site to SVTX in the conditions that existed when defendants took possession of the property. The provision in the lease between SVTX and its tenants was an extension of the conditions agreed to by SVTX and the San Jose Unified School District.

Verio installed concrete generator pads, three diesel generators, conduit, and a fuel tank with a capacity of 4000 gallons to name a few of the parts required for a diesel powered

emergency power backup system. Unfortunately, during the term of the lease, on at least one known occasion there was a discharge of the diesel fuel into the ground. Although the discharge of diesel fuel into the environment was not the result of gross negligence, this spill did in fact occur. Mr. Rubio was advised by Verio that the spill had been remediated.

In July, 2009 the defendants notified SVTX of their intent to exercise a contractual right to terminate the subleases after 10 years. The Verio sublease was to terminate June 30, 2010 while the NTTA sublease was to terminate May 31, 2010. Following the notification of their intent to vacate the premises, a representative of the defendants met with Mr. Rubio at 250 Stockton Ave. During their discussions Mr. Rubio asked the defendants representative to test for diesel fuel contamination in the area of the diesel fuel generators and diesel holding tank. The defendants representative found this request of Mr. Rubio to be entirely reasonable and agreed to conduct a requested tests.

Although the requested test for diesel fuel contamination was made in July of 2009, the promised testing was not conducted until March, 2010. When he results were obtained by the Verio representative ,the testing showed positive for diesel contamination. Although the Verio representative acknowledged extensive discussions with his immediate supervisor in Denver upon receipt of the test results that March, Mr. Rubio was not provided with any notice of the hazardous waste problem.

On or about May 19, 2010, approximately 2 months after learning of the diesel contamination problem, Mr. Rubio was informed of the diesel fuel contamination that existed at 250 Stockton Ave. Although he was not provided with a copy of the report at the time, despite repeated requests, Mr. Rubio eventually received a document in the last days of the month of May.

Defendants stated their intent to remediate the diesel contamination in the soil in accordance with their contractual obligations. Although the Verio sublease expired on the last day of June, 2010, remediation at the site did not begin until August, 2010. On February 28,

2011, some eight months after the expiration of the lease, a Verio representative forwarded correspondence to SVTX informing its landlord that in their opinion, the remediation was complete.

## ISSUES OF THE CASE

Mr. Rubio, on behalf off SVTX filed this lawsuit based on the belief that the 250 Stockton Ave. site had not been fully remediated as represented by the defendant. In addition, Mr. Rubio asked for damages for the eight month period of time that his building operation was negatively impacted by the remediation work being performed on site by the subcontractors hired by the Los Angeles-based engineering company retained by the defendants.

During the eight month period of time that Verio's contractor was on site, well over 100 holes were drilled at the site to follow the plume of diesel fuel contamination. According to the defendants' site supervisor, 210 tons of dirt or over 400,000 pounds of contaminated soil was removed from 250 Stockton Ave., and transported over 70 miles to Pittsburg, California to an approved contaminated waste site. An equal amount of sterile or clean soil was then trucked onto the site to fill the holes created by the removal of the contaminated soil.

The lawsuit filed by Mr. Rubio also seeks to recover the costs and expenses incurred as a result of his having to hire an environmental attorney, and having to absorb the additional expense of an environmental consultant who the attorney wanted to observe and report on the cleanup effort being put forth by the tenants. Plaintiff also seeks to recover the cost and expenses, including legal fees for the environmental attorney. In addition, SVTX seeks the costs, including legal fees, of bringing this case to trial.

## PROCEDURAL HISTORY

Plaintiff SVTX initiated this case with a claim for holdover rent at the rate of 150% of

1  the last month's rent pursuant to section 14 of the lease agreement.  Section 14 of the lease
2  provided that tenant shall pay for each day tenant retains possession of the "Premises" or part
3  thereof after termination of the sublease at the rate of 150% of the last rental period. "Premises"
4  is defined in the sublease as portion of the main floor and basement.

5  Defendants brought a motion for a partial summary judgment asking the court to strike
6  the claim for holdover rent at the rate of 150% of the last month's rent. The defendants motion
7  was based upon an interpretation of section 14 of the lease which dealt with the 150%
8  enhancement of rent in a holdover situation. Specifically, the work of the remediation contractor
9  was being done outside the building in the areas of the generators and fuel tank (an area leased
10 by Verio but not in the area defined as "Premises".

11 In its ruling granting the partial summary judgement motion, the court pointed out that
12 the contract provision paragraph 14, HOLDING OVER, imposes a holdover rate of 150% that
13 only applies to a holdover of the "Premises". The court noted that the reference page of the lease
14 draws a distinction between the Premises, which is defined as the space on the main floor and
15 basement of the building and the "Project" which is defined in the lease reference page as
16 including all portions of the 2.39 acres of land at 250 Stockton Ave.

17 The court specifically noted that the remediation in occurred in the area defined as the
18 Project, and not the Premises. The opinion notes that the motion of the defendants, and the
19 decision of the court, does not deal with the question of constructive possession of portions of
20 the project as this issue was not part of the motion.

21 Defendants have previously issued a settlement proposal offering $160,000. That offer
22 has expired.

23 The case has a trial date of September 16, 2013.

24
25
26

## **SIGNIFICANT OF FACTS**

Verio and NTTA America entered into separate lease agreements with Silicon Valley Telecom Exchange for space located on 2.39 acres of land located at 250 Stockton Ave., San Jose, CA. The lease site consisted of a building and outside area and was used to support the defendants telecommunications business(See lease agreement reference page).

The property is owned by the San Jose Unified School District who entered into a 25 year commercial lease with an entity named Rubio and Associates who then assigned its rights under the lease to Silicon Valley Telecom Exchange. This company developed a plan to lease at the project site to telecommunication companies such as Verio and NTTA (Court order page 2, line 22).

SVTX is under an obligation to return the leased project to SJUSD in the condition in which is was received. This condition was subsequently imposed on the sub-tenants, Verio and NTTA (Lease paragraph 39). Verio and NTTA were also provided with a complete and accurate copy of the master lease with the School Board (Master Lease Reference Page IV).

The businesses of the each of the defendants required of them to have full time backup electrical power available. Under the terms of the lease Verio was granted the right to install up to three diesel fuel generators with sufficient capacity to meet the tenants need for its projected use of the lease throughout the term of the agreement (Lease section 38.1). The tenant was also granted the right to install two diesel fuel tanks each with a capacity of up to 4000 gallons(Lease section 38.1).

Verio installed diesel generator concrete pads, three diesel generators and a fuel tank on the grounds of 250 Stockton Ave. which both Verio and NTTA used as needed (Court order page 1 line 20). The lease agreement provided the defendants with the right to install the diesel fuel emergency generators to provide backup power required by Verio (lease 1.1) with all government codes, regulations and ordinances (Contract section 38.1).

As part of the lease agreement with SVTX, Verio pledged not to permit any hazardous material to be brought, or used in or about the project in violation of any local, state or federal law (Lease 1.2)

Under the terms of its lease, Verio agreed that it would not do or permit anything to be done at 250 Stockton Ave. which would in any way of struck or interfere with the rights of other tenants or occupants of the building, or to injure annoy or disturbed them (Lease 1.1).

During the month of July, 2009 Verio, in accordance with the terms of the lease, provided SVTX with notice of its intention to exercise its contractual right to early termination of the lease after 10 years (Court order page 3 lines 7). Verio assigned Mr. Michael Day the responsibility of preparing the 250 Stockton Ave. site for return to the landlord.

Mr. Day had been employed by Verio since 2003. in his job as construction manager, he had been involved in the preparation of sites leased by Verio that were being returned to the landlord on five or six prior occasions (Day deposition page 20). it was Mr. Days job to oversee construction projects in various parts of the country as Verio was returning leased property to the owner (Day deposition page 33).

Verio's business model was changing. They had originally built multiple data centers. In 2006, 2007 the larger data centers were transitioned from Verio to NTTA. The smaller data centers that were still in existence were put up for sale. All the small data centers except for San Diego were sold (Day deposition page 29 – 30).

Verio had two classifications of data centers. One with the premier data centers which were in the 70, 80, hundred to 120,000 square-foot range and a number of small local data centers that didn't have all of the features of the big ones and were generally between eight and 15,000 square-foot units. The facility at 250 Stockton Ave. in San Jose would fit within the category of small data center (Day deposition page 30).

Mr. Day, met with Mr. Rubio, the landlord, and owner of SVTX soon after Verio

1  forwarded its lease termination notice. At this meeting in July 2009, Mr. Rubio, requested, on
2  behalf of SVTX that Verio test the soil around the generator concrete pads, the three diesel
3  generators, the fuel tank, and the conduits that carried the fuel to run the generators (Michael
4  Day's deposition page 40 ).

5  Mr. Rubio's on behalf of SVTX request was based on a spill occurring on the property
6  in 2000 which was documented in a report given to Mr. Day at the July 2009 meeting with
7  Mr. Rubio (Day deposition page 42). Nobody from Verio informed Mr. Day about the spill,
8  and a record check at Verio headquarters in Denver failed to provide any information about
9  the incident (Day deposition page 44). The Verio representative had no idea whether this spill
10 had been cleaned up (Day deposition page 44).

11 In 2009 Verio agreed to test the soil where the backup power system was located to
12 determine if there was any diesel contamination in the soil. Verio did not test the soil for
13 diesel contamination until March, 2010 eight months following the request of Mr. Rubio to
14 test the soil for diesel contamination ( Day deposition page 50).

15 From the first time Verio representative Mike Day and SVTX representative Fred
16 Rubio met, Mr. Rubio insisted that soil testing be done around the generators (Day deposition
17 page 40). The Verio representative, Mr. Day believed that the SVTX request that the soil be
18 tested for diesel contamination was a reasonable request (Day deposition page 49).

19 At in no time during his employment with Verio had Mr. Day been assigned the
20 responsibility of closing down Verio locations where question of hazardous waste was part of
21 the assigned duties. 250 Stockton Ave. was the first time Mr. Day had to deal with this
22 problem for Verio  (Day deposition page 91, 92). Prior to his work with Verio, Mr. Day had
23 never dealt with hazardous waste cleanup. At no time in his entire career had Mr. Day dealt
24 with hazardous waste cleanup prior to the issue arising at 250 Stockton Ave. (Day deposition
25 page 92).

26 Mr. Day hired Los Angeles based engineer David de Langis of Corporate Builders

1  Inc. (herein after CBI) to the test the soil's in the area of the generators at 250 Stockton Ave.
2  As requested by SVTX, the Verio representative, Mr. Day, was not involved in the testing,
3  (Day deposition page 71) just CBI. The Verio representative did not know CBI's background
4  with respect to cleaning up diesel spills when they were hired, nor were they aware of CBI's
5  background with respect to any cleanup of a hazardous substance (Day deposition page 71).
6       The result of the testing for diesel contamination at the generator site were received
7  by Michael Day who forwarded the information to his immediate supervisor Mr. Dave
8  Belcher (Day deposition page 50). The information distributed to Verio management at the
9  this time was not given to Mr. Rubio (Day deposition page 51).
10      Mr. Day and his supervisor Mr. Bellinger discussed the diesel contamination finding
11 at 250 Stockton. The decision was made to ask CBI for proposal to do remediation (Day
12 deposition page 54). CBI made a proposal to the remediation. The proposed remedial actions
13 were submitted to Mr. Rubio and SVTX for review. Modifications were made to the CBI
14 proposal as a result of suggestions from Mr. Berman, a consultant hired by SVTX's
15 enviromental attorney.
16      The Verio representative, Mr. Day, was not on site on a daily basis during the
17 remediation work being performed by CBI. Mr. Day would check on the progress every
18 couple of weeks but was not keeping track of the day-to-day operation. Nobody was keeping
19 track of what was happening at 250 Stockton Ave. on a day-to-day basis for variable (Day
20 deposition page 69).
21      Dave de Langis, the CBI engineer, was not on site on a day-to-day basis, only
22 occasionally. The only people on site were the crew hired by CBI to do the remediation. The
23 CBI hired crew did not make a report following the work that was performed each day.
24 Reports were made at the point where certain objectives were accomplished and an update
25 would be sent to Michael Day (Day deposition page 70).
26      There were discussions between Day and Belcher prior to the remediation asked

whether there was a pre-existing condition and nothing was done to determine the accuracy of that. Repairs were then ordered (Day deposition page 91).

Michael Day does not dispute the fact that Verio owned the generators, at least until June 30, 2010 (Day deposition page 93). The contamination was discovered prior to the time this gentleman believes SVTX assumed ownership of the generators (Day deposition page 93).

Verio was charged with the responsibility with restoring the site to its original condition (Day deposition page 120). Mr. Rubio was advised of Verio's interest to remove asphalt. This was being done to remediate the soil in the area where burial was showing contamination (Day deposition page 125).

Verio made the decision to remediate the diesel contamination after reviewing the test results from the site at 250 Stockton Ave. submitted by Mr. Dave de Langis and CBI Technology Group (Day deposition page 99-100). CBI began work at the site removing 210 yards of contaminated soil (Day deposition page 102). In the course of determining the extent of diesel contamination and complete remediation, CBI drilled over 100 test sample sites on the property located at 250 Stockton Ave. (Day deposition page 103).

The cost of the remediation was well over $500,000 (Day deposition page 104) all testing on the site and work was performed by CBI and the subcontractors for CBI (Day deposition page 105).

The engineer for the remediation process, Mr. Dave de Langis and CBI never produced any document indicating the site had been cleaned up (Day deposition page 142). The remediation was concluded on the last day of February, 2011 (Day deposition page 145). Verio gave Dave de Langis a contract to do the work and was his job to oversee the work (Day deposition page 148).

## HOLDOVER RENT

Holdover is defined as an extension of the original tenancy when a tenant remains in

possession with permission of the lessor after the term of the lease expires *Schmitt v. Felix* (1958) 157 Cal.App.2d 642, 646.

In the matter at bar, Verio and NTTA are holdover tenants. Verio and NTTA were in possession of the leased property with the consent of SVTX after the termination of the subleases. Verio hired and directed contractors to remediate the contaminated soil in, around and under the generators. The remediation work was performed over a period of eight months at a cost in excess of $500,000.00 - the work was not insignificant. The presence of Verio and NTTA's contractors precluded SVTX from being able to use or operate the generators and fuel tank because: the contractors were actually excavating directly underneath the generators and fuel tank rendering operation of the generators dangerous; the generators purpose is to provide uninterrupted emergency power in the event PG&E's service was interrupted and the excavation work around the generators rendered reliability of the generators questionable and the risk of failure of the generators due to workman error unacceptable; and until the remediation was complete and the cause of the soil contamination determined, SVTX could not operate the generators without risk of becoming potentially responsible with Verio and NTTA for the soil contamination and clean up. Consequently, SVTX is entitled to recovery holdover rent from Verio and NTTA during the period of the remediation work because the work constituted possession of the property and the landlord consented to the holdover. See, *SDR Associates v. ARG Enterprises, Inc.*, (1991) 170 Ariz. 1 (lessor entitled to holdover damages for a two-month period following expiration of the lease during which lessee retained possession to complete repairs of premises).

## CONCLUSION

Mr. Fred Rubio, through his closely held corporation, SVTX operated a telecommunications facility for high-profile Internet companies such as defendants Verio and NTTA at 250 Stockton Ave. in San Jose. The property was owned by the San Jose Unified

1 School District, and was leased to the Rubio business interest.

2 The nature of the defendants business required a failsafe backup electrical power
3 system to protect its equipment, and the clients of the defendants from any business
4 interruption, no matter how slight. The tenants were given the right to construct a backup
5 power system and introduce diesel fuel onto the site in exchange for the promise to accept
6 responsibility for, and to remediate any spills.

7 The failsafe backup electrical power system used diesel fuel as its power source.
8 Unfortunately during the occupancy of the project site by the defendants, a diesel fuel spill
9 or occurred on the leased property. The defendants received a request that the soil be tested
10 for diesel fuel contamination following their submission of notice that they would be
11 exercising a contractual right to terminate their lease after 10 years and leave the project site.

12 The testing results obtained by the tenants documented diesel fuel contamination
13 where their generators and fuel tanks were located. Although the request to test the site for
14 diesel contamination was made in July of 2009, the testing did not occur until March, 2010,
15 with SVTX not notified of the problem until May 19th, and not given a copy of the report
16 until the end of the month.

17 The remediation at the site did not conclude until eight months after the cleanup
18 project began, a project that required over 100 drilling sites, the removal and transport of
19 literally hundreds of tons of contaminated soil to a special landfill, and that equal amount of
20 soil being brought a the project to fill the holes.

21 The integrity of the project at 250 Stockton Ave. was directly impacted by the
22 discharge of diesel fuel into the earth and the resulting eight month cleanup project directed
23 by, paid for and completed eight months after the beginning of the remediation. SVTX seeks
24 to recover the damages to its business operations and related costs incurred as a result of the
25 diesel fuel spill at the site.

26 The combined monthly rental for the two defendants is in the excess of $75,000. The

costs for the services of the environmental attorney and the environmental consultant are in the excess of $105,000. Legal fees for services in this case call for a contingent fee with a minimum recovery based on $325 per hour. A more detailed damage statement will be presented to the court at the settlement conference.

Dated: August 27, 2013                     WILLIAMS, PINELLI & CULLEN, LLP


                                           By:   /s/ Edward F. Cullen
                                              EDWARD F. CULLEN
                                              Attorney for Plaintiff
                                              Silicon Valley Telecom Exchange, LLC